[No. 10353-9-I.   Division One.   February 22, 1982.]

THE STATE OF WASHINGTON, *Respondent*, v. DONALD
G. JESSUP, *Appellant*.

*Donald G. Jessup,* pro se, and *Mark Leemon* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *H. Duane Evans, Deputy,* for respondent.

CALLOW, J.—Donald G. Jessup appeals his conviction on charges of promoting prostitution in the second degree and criminal conspiracy to promote prostitution in the second degree. Jessup does not challenge the sufficiency of the evidence presented at trial.

King County police officers had been investigating activi-

ties occurring at a business, then known as the Kinky Korner, located near Seattle–Tacoma International Airport. Investigating officers suspected that the business was a front for prostitution. In July 1979, a young woman named "Shirley" reported to police that she had been severely beaten by a known Seattle–area procurer and desired to press charges. King County vice officers spoke with "Shirley" and obtained her consent to cooperate with their investigation by seeking employment at the Kinky Korner and serving as a confidential police informant.

"Shirley" was hired at the Kinky Korner on July 11, 1979. The following day she contacted the vice officers and asked if she should engage in prostitution if it was requested of her. Police advised "Shirley" to take those steps necessary to gather information. "Shirley" kept in daily contact with the police. After 2 weeks at the Kinky Korner, where because of the injuries suffered earlier in her beating she did not engage in sexual acts, "Shirley" moved down the block to the newly opened American Sexuality Society (Society). Over a period of 3 weeks, "Shirley" engaged in numerous acts of prostitution at the Society. As part of her employment, "Shirley" assisted other prostitutes in the business, advised one of the "supervisors" to be stricter with his prostitutes, and on one occasion unsuccessfully attempted to recruit other women to work as prostitutes. The police received continual updates on "Shirley's" activities.

Donald Jessup was one of the managers who supervised operations at both the Society and the Kinky Korner. Monies earned through the efforts of the prostitutes were turned over to him. He recruited prostitutes and hired bouncers to assist the operation. Jessup and others developed an elaborate membership card scheme designed to screen out undercover police officers and potential troublemakers. For a time, "Shirley" lived at Jessup's home.

On August 30, 1979, King County police officers made coordinated searches of the defendant's home, the Kinky Korner, the Society, and one other location. The search

warrant was issued upon the affidavit of the supervising police officer, who related the information obtained from "Shirley" and other former employees of the Kinky Korner and the Society, as well as the independent corroborating observations of the police. Seized by police were several hundred membership cards and applications, photographs, and other incriminating documents. The defendant and several others were arrested during the search and charged with promoting prostitution and conspiracy to promote prostitution.

The defendant was found guilty by a jury of promoting prostitution in the second degree (RCW 9A.88.060, .080) and conspiracy to promote prostitution in the second degree (RCW 9A.28.040). He was sentenced to the maximum term of 5 years in prison.

The defendant first argues that it is a denial of equal protection to convict him for both promoting prostitution and conspiracy to promote prostitution. The relevant statutes include:

1. RCW 9A.28.040—Criminal conspiracy.

(1) A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

2. RCW 9A.88.060.

(1) . . . A person "advances prostitution" if, acting other than as a prostitute or as a customer thereof, he . . . engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.

3. RCW 9A.88.080—Promoting prostitution in the second degree.

(1) A person is guilty of promoting prostitution in the second degree if he knowingly:

. . . .

(b) Advances prostitution.

Promoting prostitution in the second degree is a class C felony; conspiracy to promote prostitution in the second

degree is a gross misdemeanor. Equal protection of the laws is denied when the State is permitted to seek varying degrees of punishment when proving identical criminal elements. *State v. Ensminger,* 77 Wn.2d 535, 463 P.2d 612 (1970). At issue is whether conspiring to promote prostitution constitutes "any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution." *State v. Cann,* 92 Wn.2d 193, 595 P.2d 912 (1979).

■ ■ *State v. Cann* deals with the same prostitution statutes at issue here. The defendant in *Cann* challenged on equal protection grounds the prosecutor's discretion to charge him either with promoting prostitution in the second degree or with criminal solicitation to promote prostitution in the second degree. The court held that the "any other conduct" language of RCW 9A.88.060(1) embraced conduct involving speech and thereby included solicitation. RCW 9A.88.080 was held to be a special statute prohibiting conduct designed to institute, aid, or facilitate prostitution, including solicitation for such purposes. The criminal solicitation statute, RCW 9A.28.030, was held to be a general statute which could not be charged in circumstances where RCW 9A.88.080 applied. For that reason, there was no denial of equal protection since the general statute could not be charged by the State. *Cann,* at 197; *see also* 2A C. Sands, *Statutory Construction* § 51.05 (4th ed. 1973).

Here, the defendant was charged with agreeing with others to engage in conduct constituting the crime of promoting prostitution in the second degree, and that one of the parties so agreeing took a substantial step in performance of that agreement. Such activity—the agreement and the substantial step—constitutes "conduct designed to institute, aid, or facilitate an act or enterprise of prostitution." RCW 9A.88.080, being a special statute, applies to the exclusion of the general statute punishing criminal conspiracy. *State v. Cann, supra.* The State erred in charging Jessup with conspiracy to promote prostitution; the conduct complained of must fall under the special prostitution statutes.

Jessup's second contention is that the trial court erred in revoking his right to proceed pro se. Three weeks before trial, counsel for the defendant filed a motion to withdraw as attorney of record and for an order permitting the defendant to represent himself. The defendant also moved for access to legal materials and the law library, and for supplies and other items necessary to prepare his defense. The court granted the motion to represent himself, but ordered that the defendant's attorney serve as his legal assistant. The trial judge personally contacted the jail administrator and arranged for a typewriter and paper for the defendant's use. The court noted that a telephone was available for prisoners' use, and permitted the defendant to examine the State's evidence against him. The defendant's legal adviser was instructed to provide the other materials and services necessary to prepare for trial.

Several days after this ruling, on motion of the prosecutor, the court revoked the defendant's pro se status. The prosecutor argued that the defendant's legal adviser was acting as his attorney–in–fact, and that the defendant did not knowingly waive his right to counsel. The court ruled that, despite his unequivocal request to proceed pro se, the defendant did not have full knowledge of the consequences of self–representation.

■ A criminal defendant has the constitutional right to represent himself at trial. Const. art. 1, § 22 (amendment 10). The right to self–representation is also guaranteed by the sixth amendment to the United States Constitution. *Faretta v. California,* 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). *State v. Fritz,* 21 Wn. App. 354, 358–63, 585 P.2d 173 (1978), sets forth eight principles governing the exercise of the right of self–representation:

1. Every defendant in a criminal case has an independent constitutional right to represent himself or herself without the assistance of legal counsel. . . .

. . .

2. In order to exercise this right, it is incumbent on the defendant to request it, and the court is not initially

required to advise a defendant of that right. . . .

. . .

3. The right must be exercised knowingly and intelligently. . . .

. . .

4. A demand to defend pro se must be stated unequivocally. . . . Even when the right is unequivocally asserted, however, it may still be subsequently waived by words or conduct. . . .

5. The demand must be timely made. . . .

. . .

6. The right to proceed pro se cannot be used as a means of unjustifiably delaying a scheduled trial or hearing or to obstruct the orderly administration of justice. . . .

. . .

7. The right of self–representation cannot be permitted to justify a defendant disrupting a hearing or trial, or as a license to a pro se defendant to not comply with relevant rules of procedural and substantive law. . . .

. . .

8. Standby counsel may be appointed even over objection by the accused to aid the accused if and when he or she requests help, and to be available to represent the accused in the event that termination of the defendant's self–representation becomes necessary . . .

(Citations omitted.) *See also State v. Watkins,* 25 Wn. App. 358, 606 P.2d 1237 (1980).

At issue is whether the defendant knowingly exercised his right to self–representation. If the defendant was made aware of the dangers and disadvantages of self–representation, is mentally competent and alert, yet insists on proceeding pro se, the defendant has acted knowingly. A showing of technical legal knowledge is not required. *Faretta v. California, supra; State v. Fritz, supra.* A defendant proceeding pro se, however, cannot on appeal challenge the competency of his defense. *State v. Woodall,* 5 Wn. App. 901, 491 P.2d 680 (1971).

The trial court expressly held that the defendant was competent to voluntarily assert his right of self–representation, but that it doubted if he understood the conse-

quences of his action. Insofar as the court relied on the defendant's election to retain his legal adviser as a ground for its decision, it was in error. Standby counsel may be retained to aid the defendant in preparing for trial, *State v. Fritz, supra,* which in this case was necessary in light of the trial court's order requiring the legal adviser to furnish certain services to the defendant in preparation for trial.

The trial court's decision was grounded upon its observation that the defendant did not appreciate the detrimental consequences of self–representation in a criminal jury trial. The court indicated that it believed the defendant was making the wrong decision in proceeding pro se. By revoking the defendant's right to represent himself, the trial court substituted its judgment for that of the defendant. Having been made aware of the dangers and disadvantages of proceeding pro se, the defendant was entitled to represent himself. *Faretta v. California, supra.* A right is exercised "knowingly" if it is asserted willfully and intentionally. *State v. Robbins,* 15 Wn. App. 108, 547 P.2d 288 (1976). The advisability of proceeding on his own is immaterial if the defendant meets the criteria set forth.

The defendant was mentally competent, alert, and capable of representing himself. He was advised of the disadvantages of self–representation yet insisted that he be allowed to do so. A legal adviser was retained and capable of assisting the defendant. The trial court committed reversible error in revoking that right. *State v. Watkins, supra.*

This does not mean that a trial judge does not have the duty and responsibility of keeping a defendant acting as his own attorney under control. A defendant acting as his own attorney has no greater privileges than any member of the bar. He may not disrupt proceedings or intimidate witnesses. *Faretta v. California, supra; Seattle v. Torkar,* 25 Wn. App. 476, 610 P.2d 379 (1980). The trial court can require any counsel to remain behind the counsel table at all times and can restrict questioning to those matters that are relevant and material. *State v. Johnson,* 12 Wn. App.

548, 530 P.2d 662 (1975). The trial court can stop harass-
ment and abuse of a witness by a threatening defendant
and can terminate self–representation by a defendant who
engages in serious misconduct. *Faretta v. California, supra.*
*See also State v. Malone,* 20 Wn. App. 712, 582 P.2d 883
(1978). As stated in *Talley v. Fournier,* 3 Wn. App. 808,
819, 479 P.2d 96 (1970):

> [A] trial judge presiding at a jury trial is not restricted to
> the function of a mere umpire in a contest between
> opposing parties. He is charged by law and conscience
> with the fundamental duty of seeing that truth is estab-
> lished and justice done, under the statutes and rules of
> law. His control of the situation should be manifest and
> complete at all times. It is the duty of the trial judge to
> see that neither side is overreached by unfair trial tactics.
> All matters relating to the orderly conduct of a trial,
> which are not regulated by a statute or a rule, are within
> the sound discretion of the trial judge. 88 C.J.S. *Trial* §
> 36 (1955).

We must also determine whether the police tactics used
to obtain evidence was so shocking to the universal sense of
justice as to require either dismissal or the suppression of
the state agent's testimony. Acting as the agent of the
State, "Shirley" participated in acts of prostitution,
attempted to recruit new prostitutes, and advised the busi-
ness managers to be rougher with their prostitutes. The
defendant contends that, more than merely ferreting out
crime, the State created crime on a larger scale than before
"Shirley" became employed by the defendant; conduct so
outrageous that due process principles should bar use of the
testimony and require dismissal of the action.

The State asserts that they placed limits on "Shirley's"
conduct. She did not recruit new prostitutes, was prohib-
ited from harboring a 14–year–old runaway girl, and was
required to make daily reports. The State argues that her
courageous penetration of a sophisticated criminal organi-
zation led to the State's destruction of that organization,
and that, when scrutinized in light of the factual character-
istics of the enterprise she infiltrated, her conduct and

police acquiescence in it does not shock an objective sense of justice.

■ The defendant did not argue entrapment as a defense; his claim is limited to the assertion that the State's conduct was shocking to the conscience and violates public policy. Due process principles bar the government from invoking judicial processes when police conduct violates fundamental fairness or is shocking to the universal sense of justice. *United States v. Russell,* 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973); *State v. Smith,* 93 Wn.2d 329, 610 P.2d 869 (1980). The use by police of deceitful practices, paid informers, undercover agents, and the limited participation in unlawful enterprises have in specific instances been ruled permissible. *United States v. Russell, supra.*

As stated in *State v. Emerson,* 10 Wn. App. 235, 238, 517 P.2d 245 (1973):

> The kind of techniques law enforcement agencies use to detect crimes is basically a matter for the judgment of the persons charged with law enforcement responsibility. Police, like all citizens, are nevertheless subject to applicable decisional and statutory restrictions, as well as restrictions imposed by due process clauses, state and federal, and the Fourth Amendment and its corresponding article 1, section 3 of our state constitution. In crimes such as prostitution, homosexuality, liquor sales, narcotics sales and gambling, for crime detection purposes the use of the paid informer, undercover agents and deceitful practices, as well as the practice of actually aiding and abetting the commission of a crime by others, or even joining in a conspiracy for that commission, are well known. These practices, when part of a scheme of crime detection by law enforcement officers, have not ordinarily been held illegal.

The defendant's argument that he was the victim of government–induced criminality is unfounded. He has not demonstrated that the state agent's conduct increased the criminality which was already occurring. The agent found it necessary to assist in the operation of the defendant's criminal organization to gain acceptance by its members.

Her activities ceased as soon as the police had sufficient information to make arrests. The activities here do not require either dismissal of the case or exclusion of her testimony. *State v. Emerson, supra.*

We will discuss a number of other assignments of error since they are issues which probably will be present on retrial.

The defendant asserts that the trial court erred in admitting hearsay evidence about: (1) a prior violent act of the defendant; and (2) a threatening remark the defendant made about his wife. "Shirley" testified that she moved into the defendant's home at his insistence but left 1 week later when he threatened the safety of his ex–wife's children. State's witness "Carrie" testified that she committed an act of prostitution because she had heard from others that the defendant had struck another woman when he became angry at her. "Carrie" testified that the defendant had looked at her so threateningly that it "put a chill in my spine." The trial court admitted the testimony under the "state of mind" exception to the hearsay rule.

"Shirley's" testimony about the defendant's threat to his ex–wife's children is, as the State has acknowledged, prejudicial and of slight probative value. Offered merely as an example of his threatening demeanor, it served primarily as impeachment of the defendant's character. On retrial, it should be excluded.

■ "Carrie's" testimony about why she engaged in prostitution was relevant to prove whether the defendant should be convicted of promoting prostitution in the first degree. As charged in the information, "the defendant . . . did knowingly advance and profit from prostitution by compelling 'Carrie' by threat or force to engage in prostitution." Had the State not elicited testimony about why she committed prostitution, it might have failed in its burden of proving that the defendant compelled the act. "Carrie" had been told by another that the defendant had struck one prostitute for disobeying his rules. When "Carrie" initially refused to perform sexual acts, the defendant glared

at her in such a manner as to cause her to recall the prior violent act and impel her to comply with his request to commit prostitution. What "Carrie" had been told about the prior act is hearsay. ER 801(c). It was the trial court's function to decide whether the state of mind exception, ER 803(a)(3), applies. We find no abuse of discretion. The hearsay was not admitted to demonstrate that the prior violent act actually occurred, but to show that it was a factor in causing "Carrie" to engage in illegal sexual activity.

In *State v. Parr*, 93 Wn.2d 95, 606 P.2d 263 (1980), the trial court admitted testimony from the brother of a murder victim that the victim had told him that Parr had previously threatened her with a gun and that she was afraid of him. It was the only evidence introduced indicating that the defendant was a violent person. The court reversed the conviction, finding the hearsay testimony so prejudicial as to deny the defendant a fair trial. The court stated:

> It has long been established in this jurisdiction that an exception is made to the rule excluding hearsay when the state of mind or intention of a person is in question, if the court finds that two circumstances concur: (1) if there is some degree of necessity to use out–of–court, uncross–examined declarations, and (2) if there is circumstantial probability of the trustworthiness of the out–of–court, uncross–examined declarations.

*State v. Parr, supra* at 98–99. *Parr* reaffirmed that there must be a showing of relevancy and consideration of the likelihood of prejudice. We find that there was a proper basis for the trial court's ruling.

Jessup also assigns error to the admission of evidence that several State's witnesses were in protective custody as part of their immunity agreement with the State. Four State's witnesses testified on direct examination as to their understanding of the promises made to them by the State in return for their testimony. The defendant unsuccessfully moved to prohibit reference to that portion of the agreement relating to protective custody during trial and relocation after trial.

■ This is an issue of first impression in this state. In federal courts, the revelation of the terms of a cooperation agreement between the government and a witness may be introduced to rebut attacks on the witness' credibility. *See United States v. Arroyo–Angulo,* 580 F.2d 1137 (2d Cir. 1978) and cases cited therein.

> Evidence that a witness is testifying pursuant to a plea agreement is usually admissible to show bias. . . . It, like other circumstantial evidence, may be rebutted by evidence of explanation. The plea agreement may be portrayed fully and placed in context so the jury is not misled about its terms or importance. . . .
> Evidence is not admissible, however, simply because it is contained in or is offered to explain a plea agreement. References to irrelevant or prejudicial matters, for example, are often excluded.

(Citations omitted.) *United States v. Roberts,* 618 F.2d 530, 535 (9th Cir. 1980).

The terms of an immunity agreement are not admissible absent an attack on the veracity of a witness. *United States v. Arroyo–Angulo, supra;* C. McCormick, *Evidence* § 49, at 102 (2d ed. 1972). In *Arroyo–Angulo,* the court approved the trial court's exclusion of any reference to the fact that the witness' family had been placed in protective custody. In *United States v. Roberts, supra,* the court held that rule 403 of the Federal Rules of Evidence, relating to the exclusion of prejudicial evidence, applies to evidence offered to rehabilitate a witness whose credibility has been impeached.

Applying these principles, the State should not have introduced the terms of the agreement on direct examination. The trial court should have examined the evidence and excised any irrelevant or prejudicial provisions. ER 402, 403.

The trial court rejected the defendant's challenge to the search and seizure of incriminating evidence at the Kinky Korner and the Society. The defendant asserts that he had a reasonable expectation of privacy in those places and that the trial court erred in holding that the defendant could

not challenge the search of the businesses he managed. Additionally, as to the legality of the search, he contends that the affidavit of probable cause does not meet the 2–pronged test regarding the reliability and truthfulness of an informant.

■ In order to challenge a search on Fourth Amendment grounds, a person must demonstrate an actual, subjective expectation of privacy which society recognizes as reasonable. *State v. Christian,* 95 Wn.2d 655, 628 P.2d 806 (1981). In *Mancusi v. DeForte,* 392 U.S. 364, 20 L. Ed. 2d 1154, 88 S. Ct. 2120 (1968), the court permitted a defendant to challenge the search of the office he shared with others, holding that he could reasonably expect that only those who shared the office with him, or their guests, would have access to his files and records. *Mancusi,* however, is helpful only to the extent that the facts in that case resemble the facts in the present case. As argued by the State, facts produced at trial as to the nature of the defendant's role at the two businesses is irrelevant; only that evidence presented at the suppression hearing will have bearing on the defendant's expectation of privacy.

At the suppression hearing, the defendant chose to stand on the factual assertions made in the State's affidavit of probable cause and upon the legal argument that the conspiracy charge creates a proprietary interest among all coconspirators in all evidence seized by the police. The defendant has not reasserted the latter argument on appeal and it need not be addressed, except to note that there is no apparent authority for the proposition that the nature of the charges filed by the State bear upon a defendant's expectation of privacy in a particular place.

The affidavit establishes that the defendant was a manager of both enterprises and that records of the enterprises' operations were kept in office areas at both businesses. There was no evidence of (1) the physical layout of the premises; (2) who maintained control of the office areas; or (3) the number of persons with access to and control over the office. These factors were present in *Mancusi* and

weighed in the court's determination that the defendant had a reasonable expectation of privacy. The evidence here does not lead to the conclusion that the defendant had a reasonable expectation of privacy in the premises.

▮ The trial court nevertheless heard argument from the defendant challenging those searches, and ruled that if the defendant could challenge the search, the affidavit demonstrated probable cause to issue the search warrant. The affidavit was a combination of information acquired from "Shirley", "Carrie", and other prostitutes arrested by police, as well as independent police observations corroborating that information.

> When an affidavit in support of a search warrant contains hearsay information, the constitutional criteria for determining probable cause is measured by the 2–pronged *Aguilar–Spinelli* test. The first prong of the test seeks to evaluate the trustworthiness of the informant's conclusions based on the underlying circumstances and sources of his knowledge. The second prong tests veracity. It seeks to evaluate the truthfulness of the informant. *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964); *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *State v. Partin,* 88 Wn.2d 899, 903, 567 P.2d 1136 (1977). It is the second prong which is here at issue.
>
> The veracity prong of the *Aguilar–Spinelli* test may be satisfied in either of two ways: (1) the credibility of the informant may be established; *State v. Thompson,* 13 Wn. App. 526, 530, 536 P.2d 683 (1975); *State v. Walcott,* 72 Wn.2d 959, 966, 435 P.2d 994 (1967); or (2) even if nothing is known about the informant, the facts and circumstances under which the information was furnished may reasonably support an inference that the informant is telling the truth.

*State v. Lair,* 95 Wn.2d 706, 709–10, 630 P.2d 427 (1981).

The defendant challenges the informants' veracity. Inasmuch as the credibility of the informants is not established in the affidavit, the trial court must look for facts and circumstances reasonably supporting the inference that the informants were truthful. The veracity of the informants is strengthened by the detailed nature of the information they

provided. *State v. Batten,* 17 Wn. App. 428, 563 P.2d 1287 (1977). Additionally, much of the information was acquired from present or former prostitutes employed by the defendant; portions of their statements were against their penal interest. *State v. Lair, supra.* Coupled with the police officers' corroborating information, probable cause existed to issue the search warrant.

Jessup also complains of the televising of his trial. A defendant is not denied due process merely because his trial is televised. To demonstrate such a denial of due process, the defendant must present specific evidence that the conduct of the trial was adversely affected by its televising. *Chandler v. Florida,* 449 U.S. 560, 66 L. Ed. 2d 740, 101 S. Ct. 802 (1981). The defendant points to no evidence that the presence of television cameras adversely affected the trial. The argument that televising is a per se violation of due process was rejected in *State v. Wixon,* 30 Wn. App. 63, 631 P.2d 1033 (1981).

The judgment is reversed and the cause is remanded for retrial consistent with this opinion.

SWANSON and CORBETT, JJ., concur.

Reconsideration denied April 28, 1982.